The next case for argument is number 2009 1357, Delaware Valley Floral v. Shaw Rose. Good morning, I represent the appellants. I'll refer to them primarily by Mr. Shaw singularly. He did invent the patent and sued. He invented the 305 patent and applied for a patent in January of 1996. Because the plaintiffs have invoked the on sale bar as a defense, the critical date is January of 1995. We are seeking to reverse a final judgment that was preceded by a summary judgment. The application of the on sale bar rests solely on Mr. Shaw's mistaken deposition testimony, which is contradicted by both his prior answers to interrogatories and by independent declarations of Mr. Mutiah, his former colleague, and Mr. Saucedo, another of his former colleagues. So what you're asking us is to come up with what rule that notwithstanding the passage of more than 30 days following the deposition and no effort to correct the deposition, that at all times thereafter the district court is obligated to entertain affidavits or erratas with respect to a deposition? Not entirely, Your Honor. There's two aspects to that. Number one is we believe that Mr. Mutiah's testimony and other parts of Mr. Shaw's mistaken deposition testimony can be reconciled and they do enough that summary judgment should not have been granted. Can be reconciled how? What do you mean by that? Mr. Shaw said Mutiah was critical to the process. He hired Mutiah to figure it out. Mutiah did testing and experimentation and that testing occurred in 1995. All of those show that the patent was not ready for patenting under the second prong of the fact. Well, I wanted to ask you about that because at A182, this is Mr. Shaw, Mr. Shaw's testimony in the deposition. So Govind, that's Mr. Mutiah, started in September 1994 when you began commercial shipment of the products that were the subject of the patent, correct? After. What was after? He came on board after. So Govind came on board after you had already started commercially selling the products. Yes. I mean, that sounds like he's saying that Mr. Mutiah's work, whatever he was experimenting with and so forth, was after the product was ready for patenting, i.e. it was the subject of the 305 patent. Putting aside that he was mistaken about the date, I mean, that actually occurred in 1995. Well, but he'd have to make two mistakes, wouldn't he? He'd have to make a mistake with respect to whether it was 1995 or 1994, but he'd also have to make a mistake about the sequence of events between Mr. Mutiah's coming on and his having developed a ready-for-patenting invention. Yeah, I don't think that the record's really clear on the second prong, whether he was right or wrong. Is this language not clear? It seems pretty clear to me. I understand. I mean, he testified consistently it was 1994 and that Mutiah came on board after there were some sales, but he also testified… Sales of the patented product. Of roses grown using the method, correct. Right. But he does say later there was additional testing. For instance, the sales he learned that you couldn't ship the roses with the nets on because it bruised the flowers. That was a critical discovery. He also, if you read Salcedo's declaration, Salcedo says, you couldn't have done this without my nets. I found the nets and I found them in 1995, and without those nets, this whole process doesn't work because that's the heart of this is an elastic netting material. And they were testing, if you go to 185, he says, we were trying garbage bags, we were trying this. And the garbage bags testimony, he says, by the way, when was that, the plastic garbage bags? About the same time, 95. He doesn't recall when in 95. That testimony alone should have overcome… I mean, remember the burden here on ready-for-patenting and sale is clear and convincing evidence. And further, in the context of a motion for summary judgment, a single issue of disputed fact is enough to get this to the ultimate trial effect. Judge Prost, I didn't want to leave… No, but let me ask you a follow-up to that. I thought that the district court had said that ready-for-patenting was not a disputed issue. Am I wrong about that? Yeah, the order says we believe it was ready-for-patenting. I'm not sure that there was no concession by us. We raised it during the argument, although subtly, we did reference… What does that mean? I mean, what you… Well, there wasn't a heading in our opposition that we were contesting ready-for-patenting, but we brought it to the court's attention during the hearing that Mr. Mutiah was hired for testing purposes. And Mr. Mutiah… Well, everybody… I mean, but that's never been an issue, right? I mean, the deposition said that he was hired for testing. We all knew that. Correct. So that, in and of itself, doesn't necessarily go to the heart of the question about ready-for-patenting in this context, right? I mean, testing can occur throughout an extended period of time as you improve the product, and you improve, and improve, and improve it. That doesn't mean that somewhere in the middle of a long course of testing, the product was not, or the method in this case, was not ready for patenting, right? Well, that's the question, is when did it occur? And here, the court didn't make a finding in that regard, and the only evidence that the plaintiffs submitted on ready-for-patenting was Mr. Shaw's statement, we had it all ironed out in 1994. That's it. I mean, that's not enough when you balance it with here or there, we're still testing critical aspects. Well, it may or may not be enough, depending on what you argue to refute that. And I don't know what a subtle response is, but, I mean, I don't know, do we have the documents in the appendix where you raised it to the district court? I mean, what you said about that, did you say there was still testing going on, and therefore it was not ready for patenting? I don't believe I used the words ready for patenting, but if you start with the, it's appendix 440, we talk about how Mr. Mutai's role was there for testing purposes. In fact, I don't think that the plaintiffs raised ready for patenting during that hearing could be mistaken. Of course, the only testing that Mr. Shaw testified to was the testing about the garbage bags and the rubber bands, correct? That's correct. And what does that have to do with the claimed invention? Well, one of the claims talks about an elastic netting material made of rubber, so the rubber band would loosely fall into that claim. Really? Rubber band netting? Well, it's the same substance. Maybe, but it's a different thing. True. I wouldn't call it a netting. You know, a latticework of rubber bands could be a netting. I mean, he didn't describe in detail where we put just one rubber band on it. It could very well be more than one rubber band. That's an issue, unfortunately, that was not developed in the record. Of course, the district court's decision here placed emphasis on the timing and the fact that the errata sheet was submitted so late. It does strike me as being significant that the transcript was available, several weeks go by, there are no changes, and then the Rule 11 motion comes in, a few weeks go by, and then there's the errata sheet, which, you know, the light bulb came on, whoops, that was the wrong date. We meant 95 and not 94, and it strikes me as quite odd. It's obvious that Mr. Shaw was prepared before his deposition to address questions about these things because he talked about how he discussed this with counsel, he reviewed his passport, and he obviously got himself ready, and he was prepared and gave answers, and he gave answers throughout. Not only did he give answers that consistently referred to 94, but then he pointed out the discrepancy with the interrogatory answer that said, no, the interrogatory was wrong. Now, the criticality of the date should have been apparent to everybody, so it's quite surprising to me that, you know, the day after the transcript came in, somebody didn't say, oh my goodness, we made a mistake here, it was 95 and not 94. The reason, and the court was very skeptical, it was just as skeptical about when Mr. Shaw discovered Mr. Saucedo, and that skepticism permeated the court's ruling, and we think that was wrong, and I'll tell you why it was wrong. The plaintiffs argued or intimated that we should have taken Mr. Shaw aside, buttonholed him, and told him to testify to 95. But in fact, the only reason it was changed was because he spoke to Mutiah, that's in the record, and Mutiah corrected his recollection. Absent the conversation between Shaw and Mutiah, that testimony may never have been changed. I have another question about the inconsistency. In the interrogatory answer, let me see if I can put my finger on it, there was reference to the date, 95, and reference to a sale to a florist in Chicago. That's a very specific piece of information. Now, presumably that information came from someplace. Either there was a document, a record, or something. It's not in the record. I know the answer. If you want, I can tell you the answer, but it's not in the record. Again, it seemed quite curious to me that you have an interrogatory answer, obviously prepared properly so, with the consultation of counsel, and the interrogatory says quite clearly it was 95, and I know it because it was a sale to a florist in Chicago. And then, the interrogatory, the deposition is conducted, the testimony throughout is 94, 94, 94, and the statement is no, no, the 95 date was wrong. Well, Mr. Shaw looked at his passport the night before the deposition. There are stamps in Ecuador from 94, 95, 96, that's in the appendix. He chose 94, and was not, his recollection was not refreshed and corrected until he spoke to Mattia, and Mattia executed his own declaration. And what prompted, I mean, so what prompted contacting, your side contacted Mr. Mattia, right? Well, naturally, the rule 11 motion. There's no getting around that, of course. So you didn't, he didn't realize before then that there was a significance to the difference between 94 and 95? He realized, that's not in the record, Ron. I can speculate what he recognized, but there's no record site to that. So it really, this really isn't an errata type case, right? I mean, errata suggests a slip of the tongue or typographical error or something that is a mechanical fault. He believed, truly believed at the time of the deposition that 94 was the date, and he later changed his mind as to what the right date was. Isn't that a fair characterization? That seems to be consistent with what you're saying. That's a fair characterization, and the law is split. Even the regional circuit, the 11th circuit, hasn't ruled on whether you can use an errata sheet to change substance. But putting that aside, even without the errata sheet, he did execute a declaration explaining his confusion, explaining that he only changed his testimony after speaking to Mattia. And Mattia and Salcedo are what differentiates this case from any errata sheet case. There's really no case cited by either side that is close to all in all fours, because you have this independent corroboration from two witnesses, presumably with no axe to grind, that said it was 95. I think you're into your rebuttal if I read that out. So we'll save the rest of your rebuttal, and why don't we hear from the other side. Thank you. May it please the Court, Uri Fisher, although I'm arguing today for all of the appellees, I actually represent only two of them, Continental Flowers and Continental Farms. Your Honors, I believe your questions are right on point with regard to the deposition of Mr. Shaw and his errata sheet. I would like to point out some additional facts which make his changing of his mind after a testimony particularly poignant here. And I believe that Judge Jordan looked at these things and used them to convince himself that the errata sheet should not create a question of fact in this case. Particularly if you look at AA36, Mr. Shaw testified that prior to the deposition not only did he look at his passport, but he actually spoke with or communicated with Mr. Mattia. I'm sorry, what page were we? 836.  836. 836. 836. Okay, thank you. 836. And it's line 12. Okay. So although he later states that he spoke to Mattia to change his mind, it is clear, like the Court pointed out, that prior to the deposition he prepared himself to answer these questions by not only looking at his documents and his passport, but talking to Mr. Mattia or in some way communicating. It's not clear exactly what he said. And of course he confirmed this by looking at his passport and then without any hesitation at all, completely self-assured, without any equivocation, testified 18 times during his deposition that the date was September of 1994, the critical date for the sales. And the other thing that he acknowledged, as the Court pointed out, is that Mr. Mattia did not come on board to his company until after those sales were made. If you notice, the errata sheet does not correct that, so that is an undisputed fact to this day. And that's one of the reasons why Judge Jordan discounted Mattia's declaration, and that was because Mattia could not testify of personal knowledge as to those sales since he wasn't there. And under Rule 56, that's just not permitted. You can't submit an affidavit of somebody who's not testifying of personal knowledge. Yeah, but the essence of his testimony, and it wasn't hearsay, where he said in the deposition Mr. Shaw said he came on in 94, in the fall of 94, and what he corrected was that he came on in the fall of 95. That's not hearsay, right? He knows when he came on. Well, whether Mr. Shaw told him or not, even if it was hearsay, it probably could be reduced to admissible hearsay because Mr. Shaw was able to testify. But the key question was that even Mattia does not dispute that sales occurred prior to him coming on board to the company. He states that sales were done. He qualifies them as test-purpose sales. But he says sales were done and that Shaw didn't go into full commercial export of the flowers until December of 95, but he doesn't deny that sales were made before he arrived, and neither does Shaw. Shaw admits that. So what they're saying is that there were sales made, and yes, there was testing. There was testing with garbage bags. Well, except the difference is, if you read it, I mean, Shaw is saying in his deposition that sales were made shortly before Mattia arrived. I mean, if you take him at face value, he says Mattia arrived in the fall of 94. Sales were made shortly before that. I mean, he doesn't say it in those words, but that's what he said. And if you have Mattia, where it's not hearsay, if he says, no, he was wrong. I didn't come in in the fall of 94. I came in in the fall of 95. Can't that fairly lead to an inference that Shaw, the sales were made earlier in 95 and not 94? I don't believe that Shaw testified that he hired Mattia shortly after those sales were made. I think he says after he made his discovery and the sales were made, he hired Mattia. I don't think he qualifies it exactly as saying shortly thereafter. And we know from Mr. Mattia and from Mr. Shaw's testimony that from the time that he contacted Mattia until he came on board, some time went by because he had a commitment to the University of Florida or some other school. I don't remember which one. But he didn't come on board right away. So there is, again, admission on the record that some time transpired. We're not clear how much time transpired, but there's no equivocation that the sales took place before Mattia, and therefore Mattia cannot testify as to what happened before he came on board. He has no personal knowledge as to that issue, and therefore the errata sheet stands alone. Of course, Judge Jordan, although he considered the timing of the errata sheet and the circumstances surrounding it, basically reached a conclusion that because the errata sheet was so late, it didn't really matter what it said for purposes of the errata creating a question of fact, because the overwhelming majority of the cases state that if it's late, it's late and it's not admissible. I'm having a bit of a problem in trying to tease apart the issue of the belated errata sheet and those issues that are properly deemed to be within the ambit of an errata sheet versus an affidavit which simply says, you know, this wasn't an errata. This was what I truly believed to be the case at the time, but now I say in an affidavit after the deposition that I was simply mistaken, and in fact the truth is X, in this case 1995. What effect do you think the errata 30-day limit on filing an errata sheet has on filing an affidavit that falls into the category that I just described? Well, Your Honor, there are cases, and I can't tell you the size right now, but they are cited in our brief, which state that an affidavit, which basically has the same effect as the errata, is still bound by the 30-day rule, number one. Number two, there's the sham affidavit rule that says you cannot, after the fact, come in with an affidavit of yourself to contradict your earlier deposition testimony, especially as to such a critical issue and especially when it's done specifically for the purpose of overcoming a motion for summary judgment, which is what happened here. Mr. Shah may have expounded on that in his affidavit, but the bottom line is that he's again telling us the only explanation he has is, I was wrong before, I am right now. There's really no explanation by him as to why he said 1994 before, and like I said, there is no evidence on the record from his deposition that he equivocated or had any doubt at the time. The only doubts that arose were when he realized that his testimony was fatal to his claim, and that's precisely what Rule 56 is trying to avoid by limiting the type of affidavit that you can present in order to overcome summary judgment. Tell me how this case is different from the Gemi case, where it seems like there was a pretty clear affidavit signed by the President. There are a few differences, Your Honor, with the Gemi case. Specifically, well, a couple of things were shifted around. In the Gemi case, you had an affidavit or a declaration presented in conjunction with a preliminary injunction motion, and that was contradicted later on by a deposition, and it wasn't really a contradiction. It was more of a clarification, number one. That's the number one difference. Number two, the later testimony, the one from the deposition, wasn't elicited by the same party that made the original statement. It was actually a statement made by the other party, the opposing party. So it wasn't like the person who made the declaration to begin with went around shopping for different testimony. This was testimony from a defendant in the case, and like I said, it wasn't really a contradiction. What happened in that case is that it dealt with inflatable displays, and the declaration that was submitted with a preliminary injunction motion stated that the item was in sale since 2000 based on a show. It later came out in the deposition that the item that was at the show was really not the patented device, and this was clarified by one of the defendants. It wasn't by the same declarant. So there's a huge difference there. And the other difference is that the Gemi case, as we indicated, the Eleventh Circuit Law, which is applicable here, there's a line of cases decided by Judge Jordan, the Evans case, in which she says that you cannot simply take parts of your testimony and parts of other people's testimony, piece them together to create a story that you like. We owe you no duty. We buy the non-moving story in its entirety, warts and all. And that's the Eleventh Circuit Law, which didn't apply in the Gemi case. The Gemi case, I believe, was a case from the Southern District of New York that came transferred, I believe, from Kansas, but I'm not sure. But it wasn't involving Eleventh Circuit Law. So they didn't have that hurdle to get over. So on those issues, the case is very much distinguishable from this case, and I understand that there are some similarities, but as I indicated, if you look at the nuances of the case, what was said by whom and in what context, it's nothing like this case. I mean, in this case, you had clear testimony, Rule 11 motion, then bingo, testimony completely changes. That's not what happened in the Gemi case. Let me, if I could return for a second to the point that's bothering me, the distinction between the errata and the affidavit and the question of whether the affidavit is a sham affidavit. I take it, setting aside errata, suppose there had never been an errata sheet filed in this case, but all we had was an affidavit from Mr. Shaw coming in and saying, you know what, I was mistaken. I got thrown off by my passport entries and having talked to other people since I realized this was just a mistake. The district court, I take it, in that setting, has an independent obligation to look at that affidavit in the context of the deposition or whatever the prior document is in derogatory deposition, in the context of all the other evidence that the proponent offers to show that this is a bona fide mistake and can conclude that it either was or wasn't a sham affidavit. Is that your reading of the Eleventh Circuit Law? No, Your Honor. I think Eleventh Circuit Law is pretty clear that you cannot come in with your own declaration after the fact, after a deposition, to contradict your own testimony. Under any circumstances. Even if you say, you know, here's my explanation for why I thought it was the year earlier because I remembered that it was my daughter's 13th birthday when this happened, but sure enough, you know what, her 13th birthday, I checked, it occurred the year afterwards. I mean, that was just, you're saying the Eleventh Circuit would not allow a district court to consider that kind of evidence? No, you lose? Out of here? I wouldn't be as categorical as that. I think you just were, so back up a little and tell me what you think the rule is in the Eleventh Circuit. I have to be honest, I believe the rule is what I've stated, but I can't rule out that there may be some outlier cases in which that's allowed. However, another thing the court should really consider here is what happened in this case. Mr. Shaw testified that at the time he made his invention, he had 130 employees in his farm in Ecuador. From the time that we filed our Rule 11 motion until the time Mr. Shaw filed his response brief, from the time he learned of the problem until he responded, five months elapsed. There was an order from the court in which limited discovery in this case to this one specific issue, the issue of the date. 130 employees, countless of customers, countless contacts in the U.S. Not one person who was around at that time testified on behalf of Mr. Shaw. I find that extremely odd. You would think that one of those persons, in addition to his own testimony, he would have gotten the testimony of other people. Who does he go to? He goes to the one guy who can't testify about it because he wasn't around, Mr. Mattia. He does bring in some other people, but it's after the fact, after the case is already on reconsideration and there are a number of issues with the testimony of those witnesses that I can address. But basically, these were not people that he just learned about. He knew about them for all that time. He didn't present their testimony. He didn't do anything during those five months. He was perfectly happy with his testimony for two and a half months. Like you said, no light went on in his head the day he got a transcript saying, my God, this is an issue, even though he knew this was a primary issue in the case. But your position is not that he had five and a half months to do that. Your position is that after 30 days, it doesn't matter what he did after 30 days. As far as his own testimony, I think that if he would have brought other people to testify and contradict this testimony, he may have gotten some more leniency from the court. I don't think that would have done it, but he would have gotten some more leniency and more leeway from the court. But that just didn't happen. I'm just mentioning that for the fact that the statement that's been made here is that this is a manifest injustice, the fact that the patent is invalidated. It's not unjust. I mean, this is what happened in the case. This is all the evidence that was presented to the court. The only evidence was from Mr. Shaw testifying that I was wrong then, I'm right now, with no explanation. Okay. Thank you, Mr. Fisher. We'll hear a rebuttal argument from Mr. Chabin. Thank you, Your Honor. We do disagree about what the Eleventh Circuit law is as to an affidavit that contradicts prior deposition testimony because in the Van T. Junkins case and in the McCormick case, they both said we can conceive of a situation where you can introduce an affidavit that conflicts with prior deposition testimony so long as there's confusion and it's explained. And that's exactly what Mr. Shaw does in his declaration. He says, I was confused. I only recollected 1995 after I talked to Mr. Mattia. So the law is not categorical that you can never use an affidavit in the Eleventh Circuit to contradict prior deposition testimony. Also, the issue I just heard about, the 130 employees, is not raised in the brief. This is raised for the first time here today and this concept that a court should look at the weight, the number of affiance or testifiers, is ludicrous. That's not the purpose of summary judgment. The purpose of summary judgment is to critically look at the evidence and weigh all reasonable inferences in the non-movement's favor. My claim. Here, he did not. The judge did not take all reasonable inferences. In fact, he said Mr. Mattia's comment, newly discovered invention, did not mean what we all think it means. He didn't take the reasonable inference that the newly discovered meant it happened in 1995, not in 1994. And we asked him specifically to take that reasonable inference. But again, going back to his skepticism, it clouded the ruling. Mr. Mattia, in his declaration, paragraph 8231, paragraph 18, says Shaw sold some limited roses for testing purposes in the fall of 1995. Full-scale commercial sales of those roses did not occur until December 1995. So I think that answers your question before, that he does, in fact, dispute Mr. Shaw's recollection that there were full-scale commercial sales prior to Mr. Mattia coming on board. I think your question, you're grappling with the errata sheet versus the affidavit. The purpose, when you have an errata sheet that's accepted, and there is at least one case, the Wright-Jackson case out of New York, where a late errata sheet was accepted. It's not unheard of, but I'd say it's rare. You're left with the inconsistencies. You're left with the negative testimony. And that's why they put it out there, so a jury can look at the two things, weight, credibility,  on a summary judgment. Thank you. Thank you. Mr. Treven, Mr. Fisher, thank you. Council, the case is submitted. All rise.